THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD SHICK, Defendant-Appellant.

Third District   No. 3—99—0326

Opinion filed January 25, 2001.

900

Sherry R. Silvern and Thomas A. Karalis (argued), both of State Appellate Defender's Office, of Ottawa, for appellant.

James Glasgow, State's Attorney, of Joliet (John X. Breslin and Robert M. Hansen (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SLATER delivered the opinion of the court:

After a jury trial, defendant, Richard Shick, was convicted of armed robbery (720 ILCS 5/18—2(a) (West 1996)) and sentenced to a 10-year term of imprisonment. On appeal, defendant contends: (1) the trial court erred by denying his motion to quash arrest; (2) the trial court erred by denying his petition to appoint a special prosecutor; (3) he received ineffective assistance of counsel; and (4) his sentence is excessive. For the reasons that follow, we affirm.

On August 27, 1996, Stacie Flores was working as a cashier at a convenience store located at the intersection of U.S. Route 52 (Route 52) and Illinois Route 59 in Shorewood, Illinois. At approximately midnight, a man wearing a mask, a red shirt, denim jeans, and brown work boots entered the store carrying a sawed-off shotgun and demanded that Flores fill a bag with the contents of the cash register. Flores complied and observed the man flee on foot heading west. Flores then activated the store's silent alarm.

Shorewood police officers responded shortly thereafter. After interviewing Flores, one of the responding officers spoke to Craig Wagner, who had been dining at a restaurant located across the street. Wagner related that a waitress had come into the restaurant and announced that a robbery was taking place across the street. Upon exiting the restaurant to investigate, Wagner observed a man wearing a red shirt and blue jeans walking unhurriedly between some buildings west of the convenience store. He was carrying a brown bag and another unidentified object. Wagner observed him get into a white Chrysler New Yorker or Fifth Avenue with an obscured license plate and head west on Route 52.

At the time of the robbery, Angelo Sallese, a Minooka, Illinois, police officer, was on patrol in Minooka. At approximately 12:16 a.m., Sallese heard a bulletin concerning the robbery over the Wescom system, a police radio band serving the Shorewood, Channahon, and Plainfield police departments. According to the bulletin, an armed robbery had taken place in Shorewood and a suspect driving a white Chrysler with an obscured license plate had been seen heading westbound on Route 52. Sallese proceeded north on Ridge Road toward the intersection of Ridge Road and Route 52.

At a location outside of Minooka approximately two miles north of Interstate 80 (I-80), and some distance south of Route 52, Sallese encountered a white Chrysler traveling southbound on Ridge Road. The area has a posted speed limit of 55 miles per hour (mph). Although Sallese did not lock his radar gun on the Chrysler, he noted that the radar gun indicated the car was traveling at 30 to 35 mph. By the time Sallese passed the car, it had accelerated to 60 to 65 mph.

Sallese turned his vehicle around and began to follow the Chrysler. Sallese could not read the Chrysler's entire license plate number because the plate was bent. Sallese then informed the Wescom dispatcher that he believed he had found the Shorewood armed robbery suspect. While keeping the Wescom dispatcher apprised of his location, Sallese followed the Chrysler onto eastbound I-80. The Wescom dispatcher informed Sallese that other police units were on their way.

Eventually, Sallese followed the Chrysler to the junction of I-80 and Interstate 55 (I-55) where police from Shorewood, Channahon, Plainfield, Joliet, the Will County sheriff's department, and the Illinois State Police had taken position. Sallese followed the Chrysler onto the on ramp to the southbound lanes of I-55. Sallese and other police units activated their mars lights. The Chrysler stopped some 200 to 300 feet south of the on-ramp. Sallese stopped his squad car two to three car lengths behind the Chrysler and shined his spotlight on the vehicle. While Sallese stood in front of his squad car with his gun drawn and targeted on the Chrysler, defendant exited his vehicle, was handcuffed, and was placed in the backseat of a Shorewood squad car.

Shorewood police escorted Stacie Flores to the scene of the traffic stop. Flores identified a red shirt and a brown work boot recovered from defendant's vehicle as items of clothing that her assailant had been wearing. She also identified defendant as being the same height and body type as her assailant.

Police also recovered a pair of blue jeans, shotgun shells, and a brown bag filled with cash during a search of defendant's vehicle. Officer Sallese later recovered a makeshift mask and a sawed-off shotgun from an area along Ridge Road where he had first come upon defendant's vehicle.

Defendant moved to quash his arrest on the ground that he had been subject to an invalid extraterritorial arrest. The trial court denied the motion.

## I

On appeal, defendant contends that the trial court erred by denying his motion to quash arrest. In particular, defendant maintains that

his arrest was an invalid extraterritorial arrest because Officer Sallese was outside of his jurisdiction when he stopped defendant's vehicle.

■ Initially, we agree with defendant that we may not consider changes to the law effected by the enactment of Public Act 89—404 (Pub. Act 89—404, eff. August 20, 1995). Among other things, Public Act 89—404 amended section 7—4—8 of the Illinois Municipal Code (65 ILCS 5/7—4—8 (West 1996)) and added subsection 107—4(a—3) to the Code of Criminal Procedure of 1963 (725 ILCS 5/107—4(a—3) (West 1996)). These changes expanded the authority of police officers to act outside of their jurisdiction. Our supreme court has held that Public Act 89—404 was enacted in violation of the Illinois Constitution's single subject rule (Ill. Const. 1970, art. IV, § 8(d)) and must be considered void *ab initio*. See *People v. Reedy*, 186 Ill. 2d 1, 708 N.E.2d 1114 (1999). Therefore, we must apply the law as though Public Act 89—404 had never been enacted. See *People v. Gersch*, 135 Ill. 2d 384, 553 N.E.2d 281 (1990) (effect of unconstitutional amendatory act is to leave in force law as it existed prior to amendment).

We note that the amendments cited by defendant have been reenacted by Public Act 90—593 (Pub. Act 90—593, eff. June 19, 1998) and Public Act 91—319 (Pub. Act 91—319, eff. July 29, 1999). Neither act manifests any intention that its provisions have any retroactive effect. Accordingly, because the offense for which defendant has been convicted was committed prior to the time these acts became effective, neither act is applicable to the case at bar. See *People v. Digirolamo*, 179 Ill. 2d 24, 688 N.E.2d 116 (1997) (amendment presumed to apply prospectively absent contrary intention manifested in express language or by necessary implication).

■ We now turn to a determination of the appropriate standard to review the trial court's denial of defendant's motion to quash arrest. Ordinarily, a reviewing court will not disturb a trial court's ruling on a motion to quash unless it is against the manifest weight of the evidence. *People v. Wright*, 183 Ill. 2d 16, 697 N.E.2d 693 (1998). However, where neither the facts nor the credibility of witnesses is in dispute, the trial court's decision is subject to *de novo* review. *Wright*, 183 Ill. 2d 16, 697 N.E.2d 693. In the case *sub judice*, it is clear that the trial court's ruling is not based upon the resolution of conflicts in the evidence or credibility determinations. Thus, we review the decision *de novo*.

■ At common law, a police officer was without authority to effect an arrest outside the territory of the jurisdiction that appointed him unless he was in "fresh pursuit" of a suspected felon fleeing from that jurisdiction. *People v. Lahr*, 147 Ill. 2d 379, 589 N.E.2d 539 (1992). Under section 107—3 of the Code of Criminal Procedure of 1963 (the

Code) (725 ILCS 5/100—1 *et seq.* (West 1996)), "[a]ny person may arrest another when he has reasonable grounds to believe that an offense other than an ordinance violation is being committed." 725 ILCS 5/107—3 (West 1996). Recognizing that a police officer acting outside his jurisdiction retains all the rights of an ordinary citizen, Illinois courts have interpreted section 107—3 as a modification of the common law, permitting an officer to make a warrantless arrest outside of his jurisdiction if the arrest could have been made by an ordinary citizen. *Lahr*, 147 Ill. 2d 379, 589 N.E.2d 539. A necessary corollary to this interpretation is that an extraterritorial arrest will not be upheld if in making the arrest the officer uses the powers of his office to obtain evidence not available to a private citizen. *Lahr*, 147 Ill. 2d 379, 589 N.E.2d 539.

■Although it is not central to our analysis, we think it important to note that Officer Sallese effected an extraterritorial traffic stop, not an extraterritorial arrest. Drawing a gun, using handcuffs, and placing a suspect in a squad car do not transform an investigatory stop into an arrest. *People v. Ross*, 317 Ill. App. 3d 26, 739 N.E.2d 50 (2000). Regardless of the initial restraint of the person's movement, whether a stop becomes an arrest depends upon the length of time the person is detained and the scope of the investigation that follows the stop. *Ross*, 317 Ill. App. 3d 26, 739 N.E.2d 50. Sallese was not involved in detaining defendant or searching his vehicle.

■Thus, the question that is properly before this court is whether Sallese, acting as a private citizen, had the authority to stop defendant's vehicle within the meaning of section 107—3 of the Code. A statute that represents a departure from the common law will be construed to change the common law only to the extent of its express terms or the necessary implication of its express terms. *People v. Haywood*, 118 Ill. 2d 263, 515 N.E.2d 45 (1987). The express terms of section 107—3 authorize ordinary citizens to make arrests. This express power necessarily implies the power to undertake less intrusive actions, such as a traffic stop or a brief detention to await pursuing police officers, so long as there are reasonable grounds to believe the person seized has committed an offense other than an ordinance violation.

■ Officer Sallese, based on the police radio bulletin, had reasonable grounds to believe defendant had committed an armed robbery. See *United States v. Hensley*, 469 U.S. 221, 83 L. Ed. 2d 604, 105 S. Ct. 675 (1985) (reliance on radio bulletin sufficient to justify traffic stop if bulletin issued based upon reasonable suspicion that offense has been committed). In addition, we cannot say that Sallese used the powers of his office to obtain evidence unavailable to a private citizen. In his mo-

tion to quash, defendant made no showing that an ordinary citizen would not have been able to monitor the police radio band. What is more, even assuming that a private citizen would not have had access to the police radio band, Sallese was within his jurisdiction when he received the bulletin. Accordingly, Sallese was not using the powers of his office outside of his jurisdiction to obtain evidence not available to a private citizen.

We also reject the contention that Sallese's use of his radar gun outside of his jurisdiction requires defendant's arrest to be quashed. Clearly, the fact that defendant's vehicle was traveling well under the posted speed limit and then accelerated to 5 to 10 miles per hour over the limit contributed little, if anything, to Sallese's justification for effecting a traffic stop. Rather, defendant's vehicle drew Sallese's attention because it matched the description of a vehicle operated by a fleeing felony suspect and was located in an area where the suspect was likely to be.

Finally, Sallese's stop of defendant's vehicle was not tainted by the use of his radio to communicate his location to the police dispatcher or by the use 'of his mars lights, spotlight, or gun. A police officer acting outside his jurisdiction is not prohibited from acting under color of his office to effect a valid citizen's arrest. See *People v. Marino*, 80 Ill. App. 3d 657, 400 N.E.2d 491 (1980) (assertion of official authority to effect arrest irrelevant to validity of arrest itself). This principle applies with equal force to an extraterritorial traffic stop. Thus, the trial court committed no error by denying defendant's motion to quash arrest.

## II

Next, defendant contends that it was error for the trial court to deny his petition for appointment of a special prosecutor.

On August 27, 1996, while in the employ of Dunn, Martin & Miller, Ltd. (DM&M), attorney Neil Adams filed a general appearance on behalf of defendant in connection with the armed robbery charge of the instant case. On December 2, 1996, Adams left DM&M to join the Will County State's Attorney's office (the State's Attorney's office) as an assistant State's Attorney. On December 11, 1996, DM&M filed a petition to appoint a special prosecutor in 21 criminal cases, including the case at bar, in which Adams was alleged to have had substantial involvement and to have been privy to client confidences. DM&M's petition was treated as initiating a separate action from the 21 individual cases.

On December 20, 1996, the State's Attorney's office filed Neil Adams' affidavit. In the affidavit, Adams admits that he became aware of

confidential information, and that he aided in developing trial strategies, in connection with his participation as defense counsel in the cases cited in DM&M's petition. In addition, Adams states that he has not revealed any confidential information to his new employer or to anyone else. Adams also promises that he will not reveal any such information in the future or participate in the prosecution of any of the cases cited in DM&M's petition.

The trial court denied DM&M's petition. However, the trial court entered an order directing: (1) that Adams refrain from disclosing client confidences learned during the course of his employment at DM&M; (2) that Adams be disqualified from participating in the prosecution of the cases identified in the petition; (3) that the State's Attorney's office screen Adams from such participation; and (4) that Adams not be present in court during any proceedings in the identified cases.

DM&M appealed the trial court's ruling. Citing *People v. Wasilewski*, 66 Ill. App. 3d 1, 383 N.E.2d 31 (1978), this court dismissed the appeal on the ground that it was not an appeal from a final order or an order from which an interlocutory appeal is permitted.

DM&M then filed a petition to appoint a special prosecutor in defendant's cause. The petition is nearly identical to the earlier petition except that it relies on this court's decision in *People v. Courtney*, 288 Ill. App. 3d 1025, 687 N.E.2d 521 (1997), which had been decided after the denial of the first petition. In *Courtney*, we held that an entire State's Attorney's office was disqualified from prosecuting a defendant where an attorney who defended the defendant against charges brought by the office had become the county State's Attorney during the pendency of the defendant's case.

The trial court denied this second petition and reiterated its earlier order. The court distinguished *Courtney* based on its finding that Adams "holds no position of authority within [the State's Attorney's office]."

Courts across the nation have recognized that a criminal defendant's right to a fair trial is jeopardized when an attorney who has represented him, and who has been in his confidence, terminates the representation to work for the prosecution. See generally Annotation, *Disqualification of Prosecuting Attorney on Account of Relationship with Accused*, 31 A.L.R.3d 953 (1970 & Supp. 1992). In addition to the danger that the defendant will suffer prejudice from the disclosure of confidential information, courts have been concerned that this situation creates an appearance of impropriety damaging to the public's esteem of the legal profession and the criminal justice system. See,

*e.g., People v. Shinkle,* 51 N.Y.2d 417, 415 N.E.2d 909, 434 N.Y.S.2d 918 (1980).

In Illinois, it has long been held reversible error for an attorney to participate in the prosecution of a former client on charges involving a matter within the scope of the earlier representation. *People v. Gerold,* 265 Ill. 448, 107 N.E. 165 (1914). Moreover, such a conflict of interest has been regarded as a *per se* conflict, relieving the defendant of the burden of showing that he suffered actual prejudice as a result of the conflict. See *People v. Spreitzer,* 123 Ill. 2d 1, 525 N.E.2d 30 (1988). The question before us, however, is not whether a defendant's former attorney is disqualified from assisting in the prosecution of the defendant but whether his conflict of interest must be imputed to the entire prosecutor's office.

In *People v. Courtney,* 288 Ill. App. 3d 1025, 687 N.E.2d 521 (1997), this court held that, where an attorney for defendant became the county State's Attorney prior to the defendant's trial, a *per se* conflict of interest was created requiring the disqualification of the entire State's Attorney's office and the appointment of a special prosecutor. We expressly limited our holding to cases involving a chief prosecutor's conflict of interest arising from his former representation of the accused. *Courtney,* 288 Ill. App. 3d 1025, 687 N.E.2d 521.

In *Courtney,* we were principally concerned with avoiding the appearance of impropriety occasioned by a defendant being prosecuted by an office managed by his former defense counsel. However, where the former defense counsel has no managerial responsibilities, that concern is outweighed by countervailing considerations.

One such consideration is our reluctance to conclude that a *per se* rule of disqualification is required to prevent an assistant prosecutor from violating the confidences of his former client. It should be remembered that a prosecutor's obligation is not to obtain a conviction at all costs, but to see that justice is done. This court is not so cynical in its view of prosecutors to conclude that, where an assistant prosecutor does not participate in the prosecution of his former client, has no managerial role with respect to those who do, and has sworn that he has not disclosed, and will not disclose, any confidential information, the danger that he will nevertheless ignore his ethical obligations is so great that the entire prosecutor's office must be disqualified.

Another consideration is the effect a *per se* rule of disqualification would have on the ability of prosecutors' offices to hire the best possible employees. If such a rule were in place, a State's Attorney might be indisposed to hire members of the defense bar for fear that the addition of a defense attorney, especially one who had a large number of

clients, might seriously impede the functioning of the office. The consequences of such a rule would be particularly pronounced in small counties where the criminal defense bar, already few in number, represents a critical source of legal talent.

Accordingly, we hold that an assistant prosecutor's conflict of interest arising from his former representation of the defendant in a criminal prosecution does not *per se* disqualify the entire prosecutor's office from prosecuting the defendant. Rather, the trial court may exercise its discretion on a case-by-case basis to determine whether the appointment of a special prosecutor is necessary to protect the defendant's right to a fair trial.

Having determined that a *per se* rule of disqualification does not apply, we must ascertain whether, under the circumstances, the trial court abused its discretion by denying defendant's request for appointment of a special prosecutor. Defendant's former defense counsel has averred that he has neither disclosed, nor will he disclose, any confidential information regarding defendant to his colleagues at the State's Attorney's office. The trial court ordered him to keep his promise. In addition, the trial court mandated that the State's Attorney's office screen counsel from participating in defendant's prosecution. In our opinion, counsel's solemn promises and the trial court's order were sufficient to safeguard defendant's right to a fair trial.

We reject defendant's claim that appointment of a special prosecutor was necessary because any prophylactic measures taken by the State's Attorney's office to screen Adams from participating in defendant's prosecution would be ineffective. Defendant asserts effective screening is impossible because assistant State's Attorneys in Will County share office space.

Defendant's assertion is little more than bare speculation. Moreover, while screening measures might help to promote public confidence in the prosecutor's office, defendant cites no authority supporting the proposition that such measures are required. What is more, if defendant is correct that screening measures are ineffective where assistant prosecutors share office space, requiring such measures would in effect result in a *per se* rule of disqualification for a large number of prosecutors' offices in this state. Accordingly, the benefits to the public's esteem of the prosecutor's office would be outweighed by the countervailing considerations identified in our earlier discussion of the merits of a *per se* rule of disqualification. Therefore, regardless of the effectiveness of the screening measures mandated by the trial court, the trial court did not abuse its discretion by refusing to appoint a special prosecutor in the case at bar.

## III

The material in this section is nonpublishable under Supreme Court Rule 23.

## IV

█ Finally, defendant maintains that the trial court abused its discretion in sentencing him to a 10-year term of imprisonment. Specifically, defendant asserts that the trial court improperly treated his use of a sawed-off shotgun as a factor in aggravation and failed to consider, or give sufficient weight to, certain mitigating factors.

We agree with the State that defendant, by failing to file a post-sentencing motion, has waived this claim of error. See *People v. Reed*, 177 Ill. 2d 389, 686 N.E.2d 584 (1997) (to preserve sentencing issues for appeal defendant must present them to trial court in written post-sentencing motion). However, even if we were to ignore the rule of waiver, we would not find the sentence imposed by the trial court to be an abuse of discretion.

Generally, a court may not consider a factor necessarily implicit in an offense as an aggravating factor. *People v. Conover*, 84 Ill. 2d 400, 419 N.E.2d 906 (1981). Thus, a court cannot consider the mere fact that a defendant was armed with a dangerous weapon as a factor in aggravation of an armed robbery which can only be committed if one is armed with a dangerous weapon. See *People v. Rhodes*, 141 Ill. App. 3d 362, 490 N.E.2d 169 (1986). However, it is proper for the trial court to consider the degree of harm threatened by an armed robbery. *People v. Burge*, 254 Ill. App. 3d 85, 626 N.E.2d 343 (1993). In addition, because a sawed-off shotgun is one of the most dangerous and threatening of dangerous weapons, the use of that weapon threatens serious harm greater than is inherent in all armed robberies. *People v. Gray*, 212 Ill. App. 3d 613, 571 N.E.2d 489 (1991). Accordingly, the trial court did not improperly consider a factor implicit in the commission of an armed robbery when it treated defendant's use of a sawed-off shotgun as a factor in aggravation.

We find no indication that the trial court failed to consider applicable mitigating factors. See *People v. McCarthy*, 213 Ill. App. 3d 873, 572 N.E.2d 1219 (1991) (it is presumed that the court considers any mitigating evidence absent some indication, other than the sentence itself, to the contrary). We also find no abuse of discretion in the trial court's assignment of weight to the various sentencing factors. Having been convicted of a Class X felony (720 ILCS 5/18—2(b) (West 1996)), defendant was eligible to receive a prison term of 6 to 30 years (730 ILCS 5/5—8—1(a)(3) (West 1996)). A sentence that falls within the statutory guidelines will not be overturned unless it is

manifestly disproportionate to the nature of the case. *People v. Nussbaum*, 251 Ill. App. 3d 779, 623 N.E.2d 755 (1993). Considering the nature of the offense, defendant's 10-year sentence is not an abuse of discretion.

For the foregoing reasons, the judgment of the circuit court of Will County is affirmed.

Affirmed.

HOMER, P.J., and LYTTON, J., concur.